**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

———————————————————————
                                                                    )
**PAULA SUZANNE HOGAN,**                                            )
**46476 Saulty Drive**                                              )
**Potomac Falls, VA 20165**                                         )
                                                                    )
     **Plaintiff,**                        )
                                                                    )
       **v.**                     )
                                                                    )
**DAVID MAO,**                                                      )
**Acting Librarian,**                                               )
**Library of Congress,**                                            )
**101 Independence Avenue, SE**                                     )
**Washington, DC 20540**                                            )
                                                                    )
     **Defendant.**                        )
———————————————————————)

**COMPLAINT FOR DECLARATORY, INJUNCTIVE,**
**AND MONETARY RELIEF AND JURY DEMAND**

**INTRODUCTION**

1. This is an action against Defendant, David Mao ("Defendant" or "Mr. Mao", Acting

   Librarian, Library of Congress ("Library"), in his professional capacity, for declaratory and

   injunctive relief and monetary relief.  This Complaint seeks to redress harm that Plaintiff,

   Ms. Paula Suzanne Hogan ("Plaintiff" or "Ms. Hogan"), suffered as a result of Defendant's

   discriminatory and retaliatory conduct.

2. Plaintiff brings this claim pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"),

   42 U.S.C. § 2000e, *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29

   U.S.C. § 623(a)(1); and the Equal Pay Act, 29 U.S.C. § 206(d)(1), to remedy sex

   discrimination, age discrimination, and reprisal for protected activity.

3.  Suzanne Hogan began working at the Library of Congress in March 2004 – a job she held for over ten years before her termination on August 6, 2015.  Over the course of those ten years, Ms. Hogan was frequently and consistently praised for her performance and achievements.  All of her performance reviews were positive and glowing.  In July of 2014 (eleven months before her termination), Ms. Hogan was commended for her outstanding performance and contributions to the Library.  In recognition of her commitment to excellence, she was awarded a Special Achievement Award and cash award of $5,000 (the highest amount possible).  On February 4, 2015 (just six months before her termination), Ms. Hogan received a Time-Off Award of 64 hours along with another Special Achievement Award and another Cash Award of $5,000 for her outstanding performance.

4.  On December 14, 2014, Robert Newlen became Chief of Staff for the Librarian and immediately took aim at Ms. Hogan.  He did not invite her to attend important meetings that she had been attending for a decade.  He did not exclude any of Ms. Hogan's male colleagues in the same fashion.  Mr. Newlen met with all high level employees upon taking office.  He learned about their roles and had constructive conversations with them about their duties.  Mr. Newlen delayed his meeting with Ms. Hogan several times.  When Ms. Hogan finally met with Mr. Newlen (over a month after he arrived) she immediately sensed a hostile attitude from him.  He began the meeting by saying "I will let you talk."  Mr. Newlen had not read her position description and evaluations (though he had done so for her male colleagues).  After Ms. Hogan provided a brief summary of her time at the Library, Mr. Newlen questioned her abilities before taking the time to get to know her or even read the documents describing her past work record.

2

5.  About halfway through this very uncomfortable meeting, Ms. Hogan jokingly asked if she
    needed to start looking for another job.  Mr. Newlen responded, "I am not at liberty to say."
    At this point, after having met on just one occasion, Ms. Hogan feared for her job (apparently
    with good reason).  Mr. Newlen was short, abrupt, and rude to Ms. Hogan, which stood in
    stark contrast to how he treated Ms. Hogan's male colleagues.  Two weeks after Ms. Hogan's
    first meeting with Mr. Newlen, she was notified that she was being moved out of the
    Librarian's suite and relocated to the Music Division (in the basement) with a second office
    at the Packard Campus (75 miles away from the Library).

6.  Within five and a half months of his appointment (and only a couple of weeks after her last
    Special Recognition Award) Mr. Newlen concocted and brought Ms. Hogan up on a number
    of dubious charges, placed her on administrative leave, had her escorted out of the Library by
    security, and was well on his way to terminating her employment – something that appeared
    to be his goal from the moment he assumed his office.  The specific allegations he raised
    against Ms. Hogan were alternately petty, exaggerated, childish, false, and/or fabricated out
    of thin air.  Even if Ms. Hogan had been guilty of everything she had been charged with
    (which is hardly true), these particular charges were insufficient to support the termination of
    a Library employee – much less 10-year employee with an exemplary and spotless record.
    Ms. Hogan was treated adversely and differently because of her gender and her age.

**JURISDICTION AND VENUE**

7.  This case arises under the Constitution and laws of the United States and presents a federal
    question within this Court's jurisdiction under Article III of the Constitution of the United
    States, as well as 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 2000e-5(f) and 2000e-16.

8. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by rules 57 and 65 of the Federal Rules of Civil Procedure, and by the inherent equitable powers of this Court.

9. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and the parties are residents of different States.

10. Venue is proper under 28 U.S.C. § 1391(b) and (e) and 42 U.S.C. § 2000e-(5)(f) because the Library is within this judicial district, the acts or omissions giving rise to Plaintiff's claims occurred in this district, the alleged unlawful acts or omissions occurred in this district, the records relevant to the alleged unlawful acts or omissions are maintained and administered in this district, and Plaintiff worked for Defendant in this district.

11. Plaintiff fulfilled all conditions precedent under Title VII prior to filing this complaint and has exhausted her administrative remedies.  Ms. Hogan filed a formal complaint of discrimination with the Library on July 20, 2015, more than 180 days ago.  Defendant has not issued a Final Decision in her case.

**PARTIES**

12. Plaintiff, Suzanne Hogan, is an adult resident of Virginia and was at all times relevant to this Complaint an employee of the Library of Congress.

13. Defendant, David Mao, is the Acting Librarian of Congress.  As such, he heads the Library of Congress, a department within the Legislative Branch of the Government of the United States.  As the Acting Librarian, Mr. Mao is responsible for personnel actions and practices at the Library.  Mr. Mao also made the decision to terminate Plaintiff's employment with the Library.

## FACTUAL ALLEGATIONS

14. Suzanne Hogan is female and her date of birth is August 9, 1957.  Ms. Hogan was 57 years old when the Library terminated her employment.

15. Ms. Hogan began working for the Library on March 15, 2004, as Senior Advisor to the James Madison Council.

16. Ms. Hogan was hired as a GS-15, which was the same grade as when she was terminated in 2015.

17. As the Senior Advisor to the James Madison Council, Ms. Hogan reported directly to then-Librarian of Congress, Dr. James Hadley Billington.

18. At the beginning of 2007, Ms. Hogan was promoted to the position of Special Assistant to the Librarian of Congress on Special Projects.

19. Dr. Billington directed Ms. Hogan to oversee the Library of Congress' Gershwin Prize for Popular Song Award ("Gershwin Prize").

20. Upon information and belief, Ms. Hogan was paid less than male colleagues performing similar duties.

21. Ms. Hogan was paid less than Mr. Larry Stafford, the Senior Advisor to the Librarian.

22. Ms. Hogan was paid less than Mr. Ed Jablonski, the Chief Operating Officer.

23. Mr. Stafford's duties as Senior Advisor were similar to Ms. Hogan's duties as Senior Advisor and as Special Assistant.

24. Mr. Jablonski's duties as Chief Operating Officer were similar to Ms. Hogan's duties as Senior Advisor and as Special Assistant.

25. Upon information and belief, Ms. Hogan's professional experience and skills were equal to or greater than Mr. Stafford's and Mr. Jablonski's.

26. According to the Library's website, the Gershwin Prize "celebrates the work of an artist whose career reflects lifetime achievement in promoting song as a vehicle of musical expression and cultural understanding."

27. In 2012, Dr. Billington commended Ms. Hogan for her leadership of the 2011 Gershwin Prize and officially assigned her the responsibilities of leading the Library's efforts to produce all elements of the Gershwin Prize.

28. While overseeing the Gershwin Prize, Ms. Hogan established an operational and production infrastructure that did not exist before her tenure.  Ms. Hogan built critical professional relationships, established a production team, created a defensible recipient selection protocol, and led the effort to create a branding strategy that more closely aligned the Gershwin Prize with the Library's mission.

29. Ms. Hogan continued to oversee the Gershwin Prize through 2014.

30. Ms. Hogan received positive performance evaluations throughout her tenure with the Library.

31. Robert Newlen became Chief of Staff for the Librarian on December 14, 2014.

32. At the end of December 2014, Ms. Hogan became concerned that Mr. Newlen was not holding Director's meetings.

33. Ms. Hogan learned that Mr. Newlen had been holding Director's meetings in the Office of the Chief of Staff, and she had not been invited to attend.

34. Ms. Hogan's name had been removed from the email distribution list announcing the meetings.

35. Ms. Hogan had attended Director's meetings since 2004.

36. Ms. Hogan's male colleagues were not excluded from the Director's meetings.

37. The Library had two different Chiefs of Staff during the time period of 2004 – December 2014 (before Mr. Newlen), both of whom included Ms. Hogan in the Director's meetings.

38. David Mao became the Deputy Librarian of Congress on January 9, 2015.

39. On January 20, 2015, Mr. Newlen and Mr. Mao met with Ms. Hogan.

40. Since this was Ms. Hogan's first meeting with the new Chief of Staff, she expected to discuss her job responsibilities.

41. Surprisingly, Mr. Newlen had little to no knowledge about Ms. Hogan's responsibilities or professional portfolio.

42. Ms. Newlen had not read either Ms. Hogan's position description or her past performance reviews, as he had done in preparation for his meetings with Ms. Hogan's male counterparts.

43. Upon information and belief, Ms. Hogan understood that when Mr. Newlen met with male employees, he was aware of their responsibilities and had substantive discussions with them about their positions.

44. During the conversation, Mr. Newlen questioned the expenditure of certain Gershwin Trust Fund dollars, even though the Librarian had explicitly authorized the same expenditures.

45. To Ms. Hogan's knowledge, Mr. Newlen had never worked on the Gershwin Prize.

46. Mr. Newlen told Ms. Hogan he was interested in moving the Gershwin Prize to the Music Department, where it could be overseen by someone more qualified than her.

47. Ms. Hogan jokingly asked if she should start looking for another job.

48. Mr. Newlen responded sternly that he was not at liberty to say.

49. On January 23, 2015, Ms. Hogan requested a meeting with Kurt Hyde, the Inspector General, to discuss Mr. Newlen's actions and his statements.

50. Mr. Hyde informed Ms. Hogan that he believed there were discussions about moving the national programs, including the Gershwin Prize, out of the Office of the Librarian.

51. Ms. Hogan explained that the Office of the Librarian was a national operation.

52. Karl Schornagel, the prior Inspector General, had directed a member of his team to conduct a thorough review of the Gershwin Prize under Ms. Hogan's leadership.

53. The findings of that review were positive.

54. Ms. Hogan asked Mr. Hyde to look at the prior Inspector General's review and share it with Mr. Newlen and Mr. Mao.

55. On February 4, 2015, Ms. Hogan met with Mr. Newlen and Dr. Billington.  Mr. Mao did not attend the meeting.

56. During the February 4th meeting, Ms. Hogan received two documents.  The first was a letter from Dr. Billington, and the second was a Memorandum from Dr. Billington.  The subject line of the Memorandum was, "Assignments – Song of America, Packard Campus Outreach."

57. Dr. Billington copied Mr. Newlen on the February 4, 2015 Memorandum.

58. The February 4th letter commended Ms. Hogan for her exceptional work leading the Gershwin Prize.  In recognition, Ms. Hogan received a Time-Off Award of 64 hours, a Special Achievement Award, and a cash award in the amount of $5,000.

59. Dr. Billington wrote in the letter, "These awards are being given in recognition of the leadership and expertise you displayed in reconfiguring and executing all aspects of the extraordinary and tremendously successful November 19, 2014 production of the [Gershwin Prize] and the ceremonial event in its new location."

60. Dr. Billington continued, "You represented the Library well and have built positive partnerships and relationships with government officials, legal officials, production agencies, artists, and more.  You redefined the relationships between the Library and CPB, PBS, and WETA, to the benefit of all involved and also secured a substantial airline sponsorship for the event.  I applaud you for successfully developing and executing the move of the Gershwin Prize concert from the White House to Constitution Hall and highlighting the direct connection between the Prize and the Library's mission and work."

61. Dr. Billington further commended Ms. Hogan for taking the initiative to travel to Los Angeles after the concert to work directly with the PBS film producers and its CEO to ensure that Dr. Billington "and the Library were well represented in the final editing of the PBS Special, *Billy Joel: The Library of Congress Gershwin Prize*."

62. Dr. Billington credited the quality of Ms. Hogan's work for the decision the Corporation for Public Broadcasting, PBS, and WETA made to allocate ninety minutes rather than the usual sixty minutes to the nationwide televising of the show and for the enthusiasm of so many Members of Congress who attended the event.

63. The February 4th Memorandum directed Ms. Hogan to work with Mr. Newlen on the 2015 Gershwin Prize.

64. The Memorandum assigned Ms. Hogan two new projects – the Songs of American Collection and Packard Campus Outreach Activities.

65. The Memorandum also contained a section entitled, Administrative Matters, which moved Ms. Hogan's physical office from the Librarian's Suite (also called the Office of the Librarian) to the Music Division.

9

66. The Memorandum explained that Ms. Hogan would be "most productive" with an office located in the Music Division.

67. No one had expressed concerns about Ms. Hogan's level of productivity before she received the Memorandum.

68. The Memorandum instructed Ms. Hogan to also use an office at the Packard Campus, which was seventy-five miles from the Library.

69. The Memorandum did not change Ms. Hogan's supervisor, reporting structure, or portfolio of responsibilities.

70. Upon relocating, Ms. Hogan learned that her new office had mouse droppings and insufficient storage space.

71. Ms. Hogan's new office had previously been used for storage.  The Library had to make it a functional office.

72. Ms. Hogan did not receive a fully operational computer for several months after the move.

73. Ms. Hogan felt devalued and isolated from her colleagues in the Office of the Librarian.

74. Ms. Hogan's fears for her job security also increased due to the forced move.

75. Ms. Hogan expressed her concerns about her job security and how upset she was about the office relocation to Dr. Billington.

76. Dr. Billington promised to look for a new office for Ms. Hogan close to his own.

77. At that moment, there were at least three empty offices in the Librarian's Suite.

78. On April 29, 2015, Mr. Newlen issued Ms. Hogan a memorandum entitled "Administrative Leave and Notice of Intent."

79. The memorandum informed Ms. Hogan she was being placed on administrative leave, effective immediately, through May 8, 2015.

80. The memorandum stated, "management is looking into several workplace incidents in which you were involved in order to determine if you engaged in misconduct."

81. The April 29th Memorandum also ordered Ms. Hogan: not to enter any work area in the Library without prior approval from Mr. Newlen; not to discuss Library business with contractors, staff, donors, or anyone else who does work with the Library; not to take any Library materials with her; to turn in her Library cell phone; and to turn in her Library access badge and keys.

82. Also on April 29th, security officers escorted Ms. Hogan out of the Library and to her car.

83. Before the April 29th Memorandum, Ms. Hogan had never been told that her performance or conduct at the Library was unsatisfactory.

84. On May 8, 2015, Ms. Hogan's attorneys at Wilkenfeld Herendeen Law emailed Mr. Newlen to advise him that Ms. Hogan was represented by counsel and to inquire about the status of her employment.

85. Later that same day, Mr. Newlen issued Ms. Hogan a memorandum that placed her in a telework status effective May 11, 2015.

86. The memorandum also instructed Ms. Hogan regarding tasks to perform while she was teleworking.

87. None of the tasks involved substantive work assignments.

88. Among the tasks Mr. Newlen instructed Ms. Hogan to perform were summarizing her contacts with persons related to the Gershwin Prize and "describe any developments in the Library's relationship with WETA, PBS, or CPB that the Library should be aware of going into the next Gershwin Prize."

89. On May 28, 2015, Ms. Hogan again engaged in protected activity when her attorneys sent the Library a letter specifically alleging discrimination on the basis of Ms. Hogan's sex.

90. Two weeks later, on June 10th, Mr. Newlen proposed Ms. Hogan's removal from federal employment.

91. Mr. Newlen has acknowledged that he was aware of Ms. Hogan's protected activity prior to proposing her removal.

92. Mr. Mao admitted learning of Ms. Hogan's protected activity on or around June 3, 2015.

93. On June 15th, Ms. Hogan contacted an Equal Employment Opportunity ("EEO") Counselor with the Library.

94. Ms. Hogan continued her protected activity by engaging in the Library's EEO process.

95. On July 6, 2015, the Library issued Ms. Hogan a Notice of Right to File a Formal Complaint of Discrimination.

96. Ms. Hogan filed a formal complaint on July 20, 2015.

97. On August 6, 2015, Mr. Mao (one of the primary alleged discriminating officials) sustained the proposed removal.

98. Ms. Hogan's removal became effective on August 14, 2015.

99. On August 25, 2015, the Library's EEO office accepted Ms. Hogan's allegations of discrimination for investigation.

100.    The Library's EEO office revised its notice of acceptance on September 28, 2015, and again on March 2, 2016.

101.    On June 13, 2016, a designee for the Director of the Library's Equal Employment Opportunity Office concluded that Ms. Hogan's allegations of discrimination, reprisal, and a hostile work environment were unsupported by the evidence.

102.    The Library failed to analyze the evidence Ms. Hogan had presented in response to the charges against her.

103.    The Library charged Ms. Hogan with inappropriately including a contractor on email correspondence with Mr. Newlen.

104.    The contractor in question was Tim Swift, the Founder and CEO of Bounce AEG, which had served as an external producer of record for the Gershwin Prize.

105.    Throughout the course of Mr. Swift's no-cost, one-year base contract period with four option years beginning May 21, 2014, there had been many emails between Mr. Swift and various members of the Library's staff that involved the business of the Library's Gershwin Prize and its management or production of the Prize.

106.    The June 13, 2016 Director's Decision letter failed to address this evidence of pretext.

107.    Mr. Newlen also accused Ms. Hogan of entering the Congressional Research Office conference room without authorization.

108.    Ms. Hogan was the Library's official in charge of the Gershwin Prize.

109.    Ms. Hogan entered the conference room in order to obtain a Congressional calendar so as to schedule Gershwin events such that they did not conflict with the Librarian's schedule, other significant Library events, and Congress's schedule.

110.    At no time in her career had she been required to ask for permission before entering the Congressional Research Office conference room.

111.    The June 13, 2016 Director's Decision letter failed to address this evidence of pretext.

112.    The Library charged Ms. Hogan with sending emails to Gershwin donors that were critical of Mr. Newlen.

113.    The June 13, 2016 Director's Decision letter failed to address the evidence of pretext related to the email charge.

114.    For example, one of the emails Mr. Newlen relied on referred only to "unpleasant work related matters," and neither mentioned Mr. Newlen nor gave any other specifics.

115.    The Library also charged Ms. Hogan with disrespectful conduct toward Mr. Newlen during an April 28, 2015 meeting.

116.    At no time during her employment with the Library had Ms. Hogan been accused of being disrespectful.

117.    During the meeting, Mr. Newlen told Ms. Hogan that he had not met a more unprofessional person than her during his forty years with the Library.

118.    The Library also charged Ms. Hogan with attempting to use her position at the Library for private gain.

119.    Mr. Newlen explained this charge by accusing Ms. Hogan of engaging in email discussions related to nominating the Gershwin Prize broadcast for an Emmy award without his approval.

120.    The Library did not show that Ms. Hogan was required to have Mr. Newlen's approval for pursing an Emmy nomination.

121.    Dr. Billington had instructed Ms. Hogan to "work with" Mr. Newlen on the Gershwin Prize in the February 4th Memorandum, but had not given Mr. Newlen supervisory authority over Ms. Hogan on the Gershwin Prize.

122.    The Library had never disciplined Ms. Hogan prior to her removal from federal service.

123.    The Library had never counseled Ms. Hogan about her performance or conduct before removing her.

## COUNT I: UNLAWFUL TERMINATION ON THE BASIS OF SEX
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

124.    Paragraphs 1 – 123 are hereby incorporated by reference as though fully set forth herein.

125.    Under Title VII, it is an unlawful employment practice for an employer to discharge an

employee because of that individual's sex.  *See* 42 U.S.C. § 2000e-2(a)(1).

126.    On August 6, 2015, Defendant terminated Ms. Hogan's employment.

127.    Ms. Hogan experienced discriminatory harassment starting when Mr. Newlen became

Chief of Staff culminated in the termination of her federal employment.

128.    The termination was based on Ms. Hogan's sex, as evidenced by the fact that she was

treated differently than male employees throughout Mr. Newlen's tenure as Chief of Staff

and Mr. Mao's tenure as Deputy Librarian of Congress.

129.    In addition, Ms. Hogan knows of no male employees with exemplary records who were

charged with false or petty charges and subjected to investigations.

130.    Ms. Hogan is aware of male employees who were permitted to leave the Library's

employ with dignity, rather than being escorted off the premises by security.

131.    As a direct and proximate result the Library's discriminatory discharge of Ms. Hogan,

Ms. Hogan has suffered, and continues to suffer, harm and damages, including lost wages,

lost employment benefits, pain and suffering, harm to her reputation, loss of professional

development, and other pecuniary and nonpecuniary losses.

## COUNT II: UNLAWFUL TERMINATION ON THE BASIS OF AGE IN VIOLATION
## OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

132.    Paragraphs 1 – 131 are hereby incorporated by reference as though fully set forth herein.

133.    Under the ADEA, it is an unlawful employment practice for an employer to discharge an

employee because that individual is over forty years of age.  *See* 29 U.S.C. § 623.

134.    On August 6, 2015, Defendant terminated Ms. Hogan's employment.

135.    The discriminatory harassment Ms. Hogan had experienced since Mr. Newlen became

Chief of Staff culminated in the end of her federal employment.

136.    Ms. Hogan is unaware of any employee under the age of forty who was fired for

supposed misconduct after a decade of unblemished performance and conduct.

137.    As a direct and proximate result the Library's discriminatory discharge of Ms. Hogan,

Ms. Hogan has suffered, and continues to suffer, harm and damages, including lost wages,

loss in employment benefits, pain and suffering, harm to her reputation, loss of professional

development, and other pecuniary and nonpecuniary losses.

**COUNT III: UNLAWFUL TERMINATION ON THE BASIS OF RETALIATION IN
VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

138.    Paragraphs 1 – 137 are hereby incorporated by reference as though fully set forth herein.

139.    Under Title VII, it is an unlawful employment practice for an employer to discharge an

employee in retaliation for that individual's participation in protected activity.

140.    Ms. Hogan engaged in protected activity on May 28, 2015, when her attorneys sent the

Library a letter describing the sex discrimination Ms. Hogan was experiencing at the Library.

141.    Two weeks later, Mr. Newlen proposed Ms. Hogan's removal from federal employment.

142.    Mr. Newlen has acknowledged that he was aware of Ms. Hogan's protected activity when

he proposed her removal.

143.    Ms. Hogan engaged in protected activity again on June 15, 2015, when she contacted the

Library's EEO Office.

144.    Ms. Hogan continued her protected activity as she participated in the EEO process, and

filed a formal complaint on July 20, 2015.

145.    Seventeen days later, Mr. Mao terminated Ms. Hogan's employment.

146.    Mr. Mao learned of Ms. Hogan's protected activity on or about June 3, 2015.

147.    As a direct and proximate result the Library's retaliatory discharge of Ms. Hogan, Ms.

Hogan has suffered, and continues to suffer, harm and damages, including lost wages, loss in

employment benefits, pain and suffering, harm to her reputation, loss of professional

development, and other pecuniary and nonpecuniary losses.

### COUNT IV: HARASSMENT ON THE BASIS OF SEX
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

148.    Paragraphs 1 – 147 are hereby incorporated by reference as though fully set forth herein.

149.    Under Title VII, it is an unlawful employment practice for an employer to subject an

employee to a hostile work environment on the basis of that individual's sex.

150.    From the time Mr. Newlen became Chief of Staff in December 2014, Ms. Hogan was

subjected to a severe, pervasive hostile work environment on the basis of her sex.

151.    As described above, the harassment included, but was not limited to, moving Ms. Hogan

from her office in the Librarian's Suite to a former storage room in a different department,

dis-inviting her from Director's meetings, subjecting her to an unwarranted investigation into

alleged misconduct despite a decade of flawless performance and professionalism, having

security remove her from the building, and ultimately ending her federal employment.

152.    As a direct and proximate result of the discriminatory hostile work environment Ms.

Hogan experienced at the Library, Ms. Hogan suffered and continues to suffer harm and

damages, including lost wages, loss in employment benefits, pain and suffering, harm to her

reputation, loss of professional development, and other pecuniary and nonpecuniary losses.

## COUNT VI: PAY DISCRIMINATION IN VIOLATION OF THE EQUAL PAY ACT

153.    Paragraphs 1 – 152 are hereby incorporated by reference as though fully set forth herein.

154.    Under the Equal Pay Act, it is unlawful for an employer to compensate an employee at a

lower pay level than similarly-situated employees because of the employee's sex. *See* 29

U.S.C. § 206(d).

155.    As described above, Ms. Hogan was paid less than male employees with equal

qualifications and experience who were performing substantially similar duties.

156.    As a direct and proximate result of the Library's failure to compensate Ms. Hogan at the

same pay level as male employees performing substantially equal work that required

substantially equal skill, effort, and responsibility, Ms. Hogan suffered and continues to

suffer harm and damages, including lost wages, loss in employment benefits, pain and

suffering, harm to her reputation, loss of professional development, and other pecuniary and

nonpecuniary losses.

## PRAYER FOR RELIEF

**NOW, WHEREFORE,** Ms. Hogan respectfully requests that this Court enter judgment in her

favor and against Defendant, and award the following relief:

a.  Declaratory relief, including but not limited to a declaration that Defendant violated Title

VII, the ADEA, and the Equal Pay Act;

b.  Appropriate injunctive relief, including but not limited to reinstatement and an order

restraining Defendant from engaging in further discriminatory and retaliatory conduct;

c.  Back pay and benefits, in amounts to be determined at trial, along with credit for job

seniority since August 14, 2015;

d.  Front pay, in the event reinstatement is not granted;

e.  Compensatory and consequential damages, including for emotional distress, in an amount to be shown at trial, but in no event less than $100,000;

f.  Liquidated damages of an amount to be determined at trial;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Reimbursement of attorneys' fees and costs incurred in this action; and

i.  Other relief as justice allows.

## JURY DEMAND

Ms. Hogan seeks trial by jury on all matters and issues that can be so tried.

Dated: June 29, 2016                                        Respectfully submitted,

Ari M. Wilkenfeld (Bar No. 14006)
Wilkenfeld Herendeen Law
1726 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
ari@wilkenfeldlaw.com

Katherine R. Atkinson (Bar No. MD17246)
Wilkenfeld Herendeen Law
1726 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
katherine@wilkenfeldlaw.com

ATTORNEYS FOR PLAINTIFF