# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PAULA SUZANNE HOGAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 16-cv-1382 (TSC)** |
| ) | |
| **CARLA HAYDEN,** ) | |
| **Librarian of Congress** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Plaintiff Paula Suzanne Hogan, a former employee of the Library of Congress (the Library), brings this suit against Defendant, Carla Hayden,[1] Librarian of Congress, alleging gender discrimination, a hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1); and pay discrimination under the Equal Pay Act, 29 U.S.C. § 206(d)(1).

Currently pending before the court is the Library's Motion for Summary Judgment. Def.'s Mot. Summ. J., ECF No. 20. For the reasons set forth below, the court will grant the motion.

---

[1] Carla Hayden is substituted for David S. Mao as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d).

## I.    BACKGROUND

The Library hired Hogan in 2004.  *See* Def.'s St. of Material Facts As To Which There Is No Dispute (Def.'s SOF), ECF No. 20-2 ¶ 1.[2]  In 2012, Hogan began to manage the Library's Gershwin Prize for Popular Song (Gershwin Prize).  *Id.* ¶¶ 17, 22.  On August 6, 2015, the Library terminated Hogan from her position as Special Assistant to the Librarian.  *Id.* ¶¶ 3, 84.

Dr. James Billington, the Librarian of Congress during all relevant times in this case, appointed Robert Newlen to the position of Chief of Staff in December 2014.  *Id.* ¶¶ 6–7.  As Chief of Staff, Newlen oversaw six divisions within the Office of the Librarian.  *Id.* ¶ 10.  The parties dispute whether Newlen supervised Hogan and whether she reported to Newlen or Billington between December 2014 and her termination in August 2015.  Pl.'s Resp. to Def.'s St. of Undisputed Fact (Pl.'s Resp. to Def.'s SOF), ECF No. 22-2 ¶ 9.

Once Newlen became Chief of Staff, he met individually with all staff in the Office of the Librarian, including Hogan, to discuss their roles and responsibilities.  *Id.* ¶ 30.  Hogan first met with Newlen and the newly-appointed Deputy Librarian, David Mao, on January 20, 2015.  *Id.* ¶¶ 34–36.  The parties dispute the purpose of the January 20 meeting and whether Newlen attempted to learn about or discuss Hogan's role.  *Id.* ¶ 37.  On February 4, 2015, Newlen and Billington met with Hogan to inform her of the decision to relocate her office and the Gershwin Prize responsibilities from the Office of the Librarian to the Music Division, in the same building.  Def.'s SOF ¶ 43. They also informed Hogan that she was receiving: (1) access to

---

[2] The facts relied on by the court in this opinion are taken from the Library's statement of facts (Def.'s SOF) and are undisputed.  Of the 122 facts provided in Defendant's statement of facts, Hogan contests only twenty-three.  The remaining uncontested facts are admitted.  *See* Local Civil Rule 7(h)(1) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues.").

additional office space at the Library's facility in Culpeper, VA, (2) two additional work responsibilities beyond the Gershwin Prize, and (3) a "Time-Off and Special Achievement" award for her work on the 2014 Gershwin Prize. *Id.* ¶¶ 43–45; Pl.'s Resp. to Def.'s SOF ¶¶ 39, 41.

On April 17, 2015, Hogan copied Tim Swift, CEO of Bounce, the production company that oversees the Gershwin Prize, on her e-mail to Newlen inquiring about funds for submitting the Gershwin Prize for consideration for an Emmy Award. Def.'s SOF ¶ 51. Newlen removed Swift from the e-mail chain and told Hogan to consult with the Office of the General Counsel (OGC) regarding funding. *Id.* ¶ 52. On April 22, 2015, Hogan again copied Swift on an e-mail to Newlen, along with two OGC attorneys and Billington's confidential assistant, stating that she believed funding was available for the Emmy nomination and that she had "great concerns about our way forward and our support for those entities who have supported the Library." *Id.* ¶ 55. Newlen replied, once again removing Swift from the e-mail, asking Hogan for a budget for an Emmy nomination submission, along with a series of questions about the award. *Id.* ¶ 56. The parties dispute whether Hogan told Newlen that her name would be the only Library employee listed on the Emmy nomination and award. Pl.'s Resp. to Def.'s SOF ¶ 110.

On the evening of April 24, Hogan entered the Congressional Relations Office (CRO) conference room to look for a congressional calendar. Def.'s SOF ¶¶ 57–59. The Library considers the CRO to be restricted space because it contains "sensitive files about Congressional members and their inquiries to the Library." Pl.'s Resp. to Def.'s SOF ¶ 60. The parties dispute whether Hogan needed permission to be in the CRO after hours. *Id.* ¶ 61. Congressional Relations Specialist Brian Williams walked into the CRO conference room as Hogan was looking through a box of "briefing folders" prepared for new Members of Congress and their

staff. Def.'s SOF ¶¶ 57, 59. When Williams and Kathleen Ott, Williams' supervisor and the CRO Director, met the following week, Williams told Ott that he had seen Hogan looking through files in the CRO conference room. Pl.'s Resp. to Def.'s SOF ¶ 62. Ott immediately reported the incident to Newlen because she believed Hogan engaged in inappropriate and unprofessional behavior. Def.'s SOF ¶ 64. Hogan claims that before entering the conference room she checked to see if Ott was in her office and that she had called Ott's office to ask for a calendar. Pl.'s Resp. to Def.'s SOF ¶ 63.

Because Hogan had copied Swift on internal e-mail chains and entered the CRO conference room after hours, Newlen sought access to Hogan's e-mail account on April 27, 2019 to determine whether she was engaging in other misconduct. Def.'s SOF ¶¶ 68–69. Newlen requested access to Hogan's e-mails pursuant to Library of Congress Regulation (LCR) 1621, which authorizes the Library to access and monitor an employee's use of her government computer in several instances, including if management believes the employee has engaged in misconduct. *Id.* ¶ 66; Pl.'s Resp. to Def.'s SOF ¶ 65. The parties dispute whether the Library was required to notify Hogan that her e-mails were being monitored and whether Library employees have an expectation of privacy with respect to their e-mail communications, Pl.'s Resp. to Def.'s SOF ¶¶ 65, 73, but it is undisputed that Library employees are notified by a security banner each time they log onto their computer stating that their e-mails are subject to monitoring and review by Library management. Def.'s SOF ¶ 67.

While Newlen waited for approval to access Hogan's e-mails, he met with Hogan on April 28, 2015. The parties dispute the purpose of the meeting, but it is undisputed that during the meeting, Newlen instructed Hogan to stop copying Swift on internal Library communications. *Id.* ¶ 94. Both Newlen and Hogan allege the other party engaged in hostile

behavior during this meeting. Pl.'s Op. Summ. J., ECF No. 22-5, Ex. 22 at 14 (Hogan's Answers to Interrog.) ("Mr. Newlen raised his voice, criticized me, and called me a liar. . . . Mr. Newlen raised his voice and said, 'You think everything is about you – stop being so emotional. You are the worst, most unprofessional employee I have seen in 40 years, I feel embarrassed for you.' The meeting ended when he yelled for me to get out of his office."); Notice of Proposed Adverse Action, ECF No. 22-6, Ex. 50 at 4 ("During our meeting [Hogan] continued to interrupt me as I was talking and became increasingly agitated and disrespectful in deportment towards me. Specifically, [Hogan's] face turned red, [she] pointed [her] finger at me, began moving forward in [her] chair and became very loud and agitated.").

The Library's Information Technology Security Group approved Newlen's request, and he received access to Hogan's e-mails on April 29, 2015. *Id.* ¶ 70. After Newlen began his review, he asked the OGC to complete the review to determine whether there were other acts of misconduct. *Id.* ¶ 71.

The same day he received access to Hogan's emails, Newlen issued Hogan an "Administrative Leave and Notice of Intent" memorandum, which placed her on administrative leave while the Library investigated whether she engaged in misconduct. Pl.'s Op. Summ. J., Ex. 47. While the parties dispute whether Hogan could remain on administrative leave indefinitely, Newlen issued Hogan a telework status memorandum on May 8, 2015, converting her administrative leave status to telework status. Pl.'s Resp. to Def.'s SOF ¶ 77.

The Library alleges the search of Hogan's e-mails revealed several instances of inappropriate conduct, insubordination, and ethical violations. Def.'s SOF ¶ 78. It claims the e-mails showed that Hogan allegedly violated Library of Congress Regulation (LCR) 2023-5, *Gifts, Entertainment and Favors*, which bars employees from soliciting or accepting any gift,

including entertainment, from a person who has, or is seeking to obtain, contractual or other business or financial relations with the Library. *Id.* ¶ 93. At Hogan's urging, the Library had formally contracted with Swift's company in May 2014 to produce the Gershwin Prize. *Id.* ¶¶ 23, 85–87. From 2013 through 2015, Hogan accepted tickets from Swift to the Grammys and MusiCares awards shows and solicited a Grammys ticket for her sister. *Id.* ¶¶ 23, 85–93. The parties dispute whether Hogan received approval to attend the shows. Pl.'s Resp. to Def.'s SOF ¶¶ 89, 92. The e-mails also revealed that Hogan forwarded four internal Library e-mails to Swift immediately after Newlen instructed her to stop copying Swift on internal e-mails, Def.'s SOF ¶ 96, including one e-mail that said the following: "Just to keep you up to date. Since they get upset when I CC you, I did not want to take a chance that they would check my e-mail for a BCC so here you go." *See* ECF No. 20-9, Ex. 55 (Hogan Email). Hogan also sent several e-mails to longstanding Library donors, artists, contractors, and partners between February and April 2015, complaining about Newlen and the Library, in violation of Library of Congress Regulations 2023-2, *Conduct in Official Positions*, and 2023-1, *Personal Conduct and Personal Activities of the Staff of the Library of Congress: Purpose, Policy, and General Standards*. Def.'s SOF ¶¶ 97–107. Hogan also e-mailed a Library partner on March 27, 2015, stating she would be "happy to go around the new leadership and appeal directly to the Librarian." *Id.* ¶¶ 102, 111. Finally, the e-mails showed that Hogan continued to pursue the Emmy nomination with contractors despite Newlen's concerns about the cost, *id.* ¶ 113, although the parties dispute whether Newlen directed Hogan to stop working on the submission. Pl's Resp. to Def.'s SOF ¶ 114.

Newlen met with Ashley Wang, Team Leader for Employee Relations Team in the Office of Workforce Management, who concluded Hogan's removal was justified based on the "totality

of the misconduct." Def.'s SOF ¶ 80. On May 11, 2015, Wang was instructed to start working on the Notice of Proposed Adverse Action to terminate Hogan. *Id.* ¶ 81.

On June 10, 2015, Newlen issued Hogan a Notice of Proposed Action to terminate her employment. *Id.* ¶¶ 78, 82; ECF No. 22-6, Ex. 50. The Notice listed eight reasons for Newlen's recommendation that she be terminated: (1) entering the CRO conference room after hours; (2) sending multiple inappropriate e-mails to donors, artists, contractors, and partners between February and April 2015; (3) engaging in inappropriate conduct during the April 28, 2015 meeting; (4) using her position for private gain related to the Emmy submission; (5) lacking candor in the March 27, 2105 e-mails; (6) violating the Library's ethical rules by accepting and soliciting tickets from a contractor; (7) questioning Newlen's decision-making to subordinate employees and an outside contractor in an April 17, 2015 e-mail; and (8) forwarding an internal Library e-mail to Swift after Newlen instructed Hogan to not copy contractors on internal communications. Pl's Resp. to Def.'s SOF ¶ 79.

The Notice of Proposed Action advised Hogan that she could reply directly to Mao, and Hogan submitted her reply around July 8, 2015. Def.'s SOF ¶¶ 82, 83; Notice of Proposed Adverse Action at 2. Mao upheld the decision to terminate Hogan and sent her the Library's final termination decision on August 6, 2015. Def.'s SOF ¶ 84; Mao Letter to Hogan, ECF No. 20-4, Ex. 47.

Hogan filed this suit on June 29, 2016 alleging gender discrimination (Count I), retaliation (Count III), and a hostile work environment in violation of Title VII (Count IV); age discrimination in violation of the ADEA (Count II); and pay discrimination in violation of the EPA (Count V). The Library filed a motion to dismiss Hogan's EPA claim (Count V), ECF No. 11, which Hogan did not oppose, and which the court granted on December 22, 2016.

The Library has now moved for summary judgment on Hogan's claims for gender discrimination (Count I), retaliation (Count III), hostile work environment (Count IV), and age discrimination (Count II). Hogan opposes summary judgment only on the gender discrimination (Count I) and hostile work environment (Count IV) claims. Because Hogan fails to address the Library's age discrimination (Count II) and retaliation (Count III) claims in her opposition to summary judgment, the court treats both as conceded and will grant summary judgment to the Library on these claims. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997)); *see also Hajjar–Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 128 (D.D.C. 2014) ("A Plaintiff is not entitled to rely on the allegations in h[er] Complaint to create a genuine issue of material fact at the summary judgment stage.").

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At the summary judgment

stage, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . .' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp,* 477 U.S. at 324. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 – 50 (citations omitted).

## III.    ANALYSIS

### A.  Title VII Gender Discrimination Claim

Hogan alleges the Library—specifically, Newlen—discriminated against her because of her gender.  Title VII prohibits an employer from discriminating against its employees in hiring decisions, compensation, terms, conditions, or privileges of employment on the basis of an individual's sex.  42 U.S.C. § 2000e–2(a)(1).

Title VII discrimination claims are analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973).  *See Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338 (2015) (applying the *McDonnell Douglas* framework in a Title VII case).  Under this framework, the plaintiff has the initial burden of proving a prima

facie case of discrimination. *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 253. If the employer proffers such a reason, the burden shifts back to the plaintiff to prove that the legitimate reason provided by the employer was in fact pretext for discrimination. *Id.*

However, at the summary judgment stage, where the defendant provides a legitimate, nondiscriminatory explanation for its actions, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Rather, at that point the court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* (citations omitted).

The D.C. Circuit recently clarified that *Brady*'s focus on the third prong of the *McDonnell Douglas* analysis is merely a "shortcut" and does not "imply that the District Court may relieve the employer of its burden, at the second prong, to articulate a legitimate, nondiscriminatory reason for its action." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (internal citations and quotation marks omitted). The *Figueroa* court clarified four factors that determine the adequacy of an employer's evidentiary proffer in most cases: (1) "the employer must produce evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) if the factfinder believes the evidence, it "must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the "nondiscriminatory explanation must be . . . facially credible in light of the proffered evidence"; and (4) the evidence must present "a clear and reasonably specific explanation" such that the employee has "a full and

fair opportunity to attack the explanation as pretextual." *Id.* (internal citation and quotation marks omitted). Therefore, under the second step of the *McDonnell Douglas* analysis, the court will first analyze whether the Library proffered legitimate, nondiscriminatory reasons for Hogan's termination in accordance with the *Figueroa* factors.

> 1. <u>The Library Provided Legitimate, Nondiscriminatory Reasons For Hogan's Termination.</u>

The Library produced evidence that Hogan was fired because, *inter alia*, her e-mails revealed multiple instances of insubordination, jeopardizing sensitive Library relationships, and that she accepted gifts from Library contractors in violation of Library regulations. Under the four *Figueroa* factors, the Library has proffered legitimate, non-discriminatory reasons for Hogan's termination, and therefore has met its burden under the second prong of *McDonnell Douglas*. *See Figueroa*, 923 F.3d at 1087.

First, the court will consider the evidence proffered by the Library, because Hogan does not contest or object to its admissibility. *Id.*; *cf. Ali v. D.C. Gov't*, 801 F. Supp. 2d 78, 83 (D.D.C. 2011) ("Rule 56 allows a party . . . opposing summary judgment to object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." (citing Fed. R. Civ. P. 56(c)(2)) (internal quotation marks omitted).

Second, the Library presented evidence that would allow a jury to reasonably conclude that it had legitimate reasons—independent of gender—to terminate Hogan's employment. *See Figueroa*, 923 F.3d at 1087. Insubordination is a "commonly asserted, legitimate, non-discriminatory reason for taking an adverse employment action." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 118 (D.D.C. 2015); *see also Smith v. Dist. of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (affirming that an employee's "negligence and insubordination (including discourteous treatment of her supervisor)" were legitimate, non-discriminatory reasons for

adverse action). The Library provided undisputed evidence that Hogan shared internal e-mails with Swift after Newlen ordered her to stop copying outside contractors on internal Library communications. *See* Def.'s SOF ¶¶ 94, 96; Hogan Dep. at 130:15–25, 131:1–8. In addition, dissatisfaction with an employee's performance and identifying specific examples of the employee's inadequate performance is a legitimate, non-discriminatory reason for an adverse action. *See Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997). The Library proffered several e-mails in which Hogan interacted with Library donors and associates in a way that was critical of the Library and its staff. Finally, employee actions that are "in clear violation" of the company's code of ethics or policy are legitimate, non-discriminatory reasons for adverse action. *Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 95 (D.D.C. 2001). The evidence in the record also shows that Hogan violated the Library's ethics policy, LCR 2023-5, by accepting and soliciting tickets to awards shows from a Library contractor before and after they signed a contract with the Library. Specifically, LCR 2023-5 states: "[S]taff members shall not solicit or accept, directly or indirectly, any gift, gratuity, favor, entertainment, loan, or any other item of monetary value, from a person who has, or is seeking to obtain, contractual or other business or financial relations with the Library." Def.'s Mot. Summ. J., Ex. 54. While the parties dispute whether Hogan accepted the tickets after receiving permission from her supervisors, that issue is irrelevant because the evidence shows Hogan specifically solicited tickets for her and her sister to attend the Grammys, which is a clear violation of LCR 2023-5. Hogan Dep. at 161:16–21 ("I would like to bring my sister to the Grammy's if two tickets are possible."). Therefore, if a jury believed Hogan was insubordinate, jeopardized sensitive library relationships, and violated ethical rules, it could reasonably find the Library was not motivated

by a discriminatory reason. *See, e.g., Varnado v. Save the Children*, 2019 WL 2184821, at *4 (D.D.C. May 21, 2019).

Third, for the same reasons as the second factor, given the record, the Library's evidence for terminating Hogan are legitimate and facially credible. *See id.*

Finally, the Library has presented a sufficiently clear and specific explanation for Hogan to have "a full and fair opportunity to attack the explanation as pretextual." *Figueroa*, 923 F.3d at 1088 (internal quotation marks and citations omitted). The Library gave specific examples and produced testimony and exhibits that show Hogan's insubordination, actions that jeopardized the Library's relationships, and ethical violations. Therefore, it has "fairly put the plaintiff on notice of what reasoning [she] must challenge." *See Figueroa*, 923 F.3d at 1091 (citing *Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003.))

2. <u>Hogan Fails To Rebut The Library's Proffered Reasons For Her Termination.</u>

Because the Library has met all four *Figueroa* factors and proffered legitimate, nondiscriminatory reasons for Hogan's termination, the question of whether Hogan made out a prima facie case of gender discrimination is no longer relevant. *See Brady*, 520 F.3d at 494. At this point, the burden reverts to Hogan to produce sufficient evidence for a jury to reasonably conclude that (1) Hogan's insubordination, jeopardizing relationships, and ethical violations were "not the actual reason" for her termination, and (2) that the Library intentionally discriminated against her on the basis of her gender. *Id*. Hogan retains the "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). Moreover, "where, as here, an employer raises several legitimate non-discriminatory reasons for an adverse employment action, a plaintiff must show that each of them is merely a pretext for a discrimination." *Cox v. Nielsen*,

2019 WL 1359806, at *21 (D.D.C. March 26, 2019); *see also Hairston v. Boardman*, 915 F. Supp. 2d 155, 161 (D.D.C. 2013) ("To defeat a Title VII defendant's summary judgment motion, a plaintiff must demonstrate pretext as to all of the defendant's proffered neutral explanations, not just some of them."). Therefore, Hogan must point to evidence that would allow a reasonable jury to find that *all* the Library's proffered reasons for firing her are pretexts to hide the fact that she was terminated because of her gender. *See Cox*, 2019 WL 1359806, at *21.

> a. *Hogan failed to produce sufficient evidence that insubordination, jeopardizing relationships, and ethical violations were not the real reasons for her termination.*

Hogan alleges that it was Newlen, not Library management, who, motivated by discriminatory animus towards her, caused the Library to fire her. Pl.'s Op. Summ. J. at 24. Under this "cat's paw" theory, an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011). To prevail under this theory, a plaintiff must show that "(1) the supervisor perform[ed] an act motivated by discriminatory animus (2) that [was] intended by the supervisor to cause an adverse employment action, and (3) that act [was] a proximate cause of the ultimate employment action." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting *Staub*, 562 U.S. at 419).

Hogan argues that Newlen's recommendation that she be fired was motivated by discriminatory animus because: (1) his reasons for recommending her termination were false; (2) he lacks credibility; (3) he failed to follow library procedures; and (4) he took steps to isolate Hogan to conceal his discrimination against her. Although Hogan contests the reasons for her termination, that is not the relevant inquiry at the summary judgment stage. *See Morris*, 825 F.3d at 671 ("[A] Title VII plaintiff cannot survive summary judgment merely by asserting that

her employer made a bad decision.") (citation omitted). "Title VII … does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions," *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation and quotation marks omitted), and a court "may not second-guess an employer's personnel decisions absent demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citation and quotation marks omitted). Instead, the appropriate question is whether Newlen *honestly believed* Hogan was insubordinate, jeopardized relationships, and violated ethical standards, and terminated her based on that belief. *See Morris*, 825 F.3d at 671 ("[The plaintiff] must raise a genuine dispute over the employer's *honest belief* in its proffered explanation.") (citation omitted and emphasis added). "A plaintiff can meet this burden by casting doubt on the objective validity of the employer's explanation." *Id.*

### i. Hogan failed to show Newlen's proffered reasons are false.

First, Hogan argues that Newlen's eight stated explanations for her termination were false and that a reasonable jury could conclude the actual reason for his action was discrimination. *See* Pl.'s Op. Summ. J. at 25; Notice of Proposed Adverse Action at 9. A plaintiff can show an employment decision was made for a discriminatory reason by "showing that the nondiscriminatory explanation the defendant proffered for its decision was false." *Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003). However, if the employer's stated belief about the underlying facts is reasonable in light of the evidence, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts. *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."). The issue here is whether Newlen "honestly and reasonably believed" in his stated reasons for her

termination. *See id.*; *Pignato v. Am. Trans. Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.").

Hogan alleges that her entering the CRO conference room and sending the e-mails on March 27, 2015, April 20, 2015, and April 28, 2015 were not inappropriate or insubordinate. However, while Hogan disputes whether she had access to the CRO, Newlen was alerted to the incident by Kathy Ott, Director of the CRO, who was concerned about the propriety of Hogan's after-hours entry to the CRO. Pl.'s Resp. to Def.'s SOF ¶¶ 61, 63. And the undisputed evidence shows that although Newlen explicitly told Hogan during a meeting on April 28, 2015 to stop sending internal Library e-mails to Swift, Hogan continued to do so. Def.'s SOF ¶¶ 94, 96. Hogan also conceded that her April 28, 2015 e-mail to Swift was an act of insubordination. Hogan Dep. at 134:20–22 ("Question: Isn't this doing exactly what Mr. Newlen told you not to do earlier that day? Answer: It is."). Even if the court accepted that Hogan's e-mails and her CRO entry were appropriate, this does not lead to the conclusion that Newlen's dissatisfaction with Hogan was false. Hogan's subjective belief is irrelevant, as the issue is whether Newlen believed that Hogan's performance or conduct was deficient. *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 10 (D.D.C. 2000), *aff'd,* 298 F.3d 989 (D.C. Cir. 2002) (citing *Vasilevsky v. Reno*, 31 F. Supp. 2d 143, 151 (D.D.C.1998) ("An employer is entitled to rely on his own perception of an employee's work performance.")); *Glass v. Lahood*, 786 F. Supp. 2d 189, 218 (D.D.C. 2011) ("[S]ubjective beliefs are wholly insufficient to establish an inference of discrimination."). Hogan has failed to point to evidence that contradicts Newlen's belief that Hogan's e-mails and CRO entry were acts of insubordination. *See Morris*, 825 F.3d at 671.

Next, the parties dispute the purpose of the meeting between Hogan and Newlen on April 28, 2015, as well as their actions during the meeting. However, Hogan does not dispute that the meeting involved a discussion of her insubordination and the CRO entry. Hogan again does not provide any evidence that Newlen's perception of her insubordination was not his honest belief. *Id.*

Hogan also alleges that Newlen manufactured concerns about Hogan's e-mails between February and April 2015, and that her e-mails were not inappropriate and did not jeopardize the Library's relationships in violation of LCR 2023-1 and LCR 2023-2. However, once again, Hogan fails to produce or point to evidence in the record that would create a genuine dispute concerning whether Newlen honestly believed her e-mails were acts of insubordination. *See Morris*, 825 F.3d at 671. Consequently, the incidents do not constitute evidence of discriminatory animus on the part of Newlen.

Hogan claims that Newlen accused her of using her position for private gain in her pursuit of an Emmy nomination, including her alleged failure to disclose that she would be the only Library employee to receive the nomination. While Hogan appears to argue that by reading between the lines, Newlen should have known she would be the only employee to receive the Emmy, this unsupported allegation is hardly evidence that Newlen did not honestly believe her actions were insubordinate and unethical. *See Morris*, 825 F.3d at 671.

Finally, Hogan contends that Newlen falsely claimed that she violated the Library's ethical policy when she solicited and accepted tickets from a Library contractor. But regardless of whether Hogan received approval from the Library to attend the events, she again produced no evidence to show that Newlen did not honestly believe she violated the Library's ethical policy or "cast doubt on the objective validity of [Newlen's] explanation[s]." *Id.*

Hogan also challenges Newlen's credibility because Newlen gave two different reasons for their April 28, 2015 meeting. *See* Newlen Dep. at 236:11–237:2 (stating the purpose of the meeting was to discuss Hogan's responsibilities with the Gershwin Prize and other projects); Notice of Proposed Adverse Action at 4 (stating the purpose of the meeting was to discuss Newlen's concerns related to Hogan's e-mail communications and entry to the CRO conference room). Inconsistencies in the employer's stated reason for adverse action can justify an inference of a discriminatory motive. *See Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) ("Such an unexplained inconsistency can justify an inference of discriminatory motive."); *Brady*, 520 F.3d at 495 n.3 (stating that employees can try to cast doubt on an employer's asserted reason by pointing to changes and inconsistencies in the employer's stated reasons for the adverse action). However, it was Hogan's alleged behavior during the April 28 meeting, not the purpose of the meeting, that factored into Newlen's decision to recommend Hogan's termination. *See* Notice of Proposed Adverse Action at 4. A few "trivial and remote" inconsistencies may not be enough for a reasonable jury to infer discriminatory intent at the summary judgment stage. *Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006) (holding that an employer's inconsistent testimony on two occasions—first regarding her involvement in a decision to reassign an employee and next involving the extent to which she assisted an employee in an appeal—were "trivial and remote" and could not permit a reasonable jury to infer discriminatory intent).

Hogan also contends that Newlen was evasive in his deposition on two occasions: (1) when he was asked about his authority to search Hogan's e-mails, *see* Newlen Dep at 223:2–13, and (2) when he was asked to list factors that would determine whether a supervisor's signature is necessary to request e-mail surveillance, *see id.* at 207:18–208:16. However, at this stage,

Hogan must point to evidence to show that Newlen's proffered reason for firing her was pretext for discrimination, *see Figueroa*, 923 F.3d at 1087, and that Newlen did not honestly believe his proffered reasons were legitimate, *see Morris*, 825 F.3d at 671. The evidence is clear that Newlen had the authority to search Hogan's e-mails, *see* Def.'s SOF ¶¶ 66–70, and he went through the proper channels and completed a request for such access, *see id.* ¶ 69; Service Unit Management Request for ITS and IT Security Group Assistance Form, ECF No. 20-7, Ex. 39. Furthermore, even if Newlen was evasive in his deposition, whether Newlen was authorized to view Hogan's e-mails does not raise a material dispute with respect to whether he honestly believed his proffered reasons for Hogan's termination were legitimate. Even when viewed in the light most favorable to Hogan, Newlen's deposition testimony has no bearing on whether his proffered reasons for firing Hogan were pretextual and would not permit a reasonable jury to infer discriminatory intent.

### ii. Hogan failed to show Newlen did not follow library procedures.

Hogan argues that Newlen failed to follow established procedures when he placed her on administrative leave and later terminated her. An "employer's failure to follow established procedures or criteria" may be evidence of pretext that allows an employee to survive summary judgment. *Wang v. WMATA*, 206 F. Supp. 3d 46, 68 (D.D.C. 2016) (quoting *Brady*, 520 F.3d at 495 n.3).

First Hogan alleges Newlen violated the Library's administrative leave policy, which requires the Director of Human Resources, Dennis Hanratty, to approve any decision to place an employee on administrative leave for more than one day. *See* Pl.'s Op. to Summ. J., Ex. 61 at 2. Newlen testified that Hanratty was involved in the decision to place Hogan on leave, *see* Newlen Dep. at 118: 18–22, but the Library's interrogatory response did not indicate whether Hanratty

was the decision maker, *see* Library's Answers to Interrog. at 5. Given the Library's response, Hogan argues there is no evidence that Hanratty was involved in the decision to place her on leave. *See* Pl.'s Op. Summ. J. at 39. But Newlen's deposition presents the evidence that Hogan contends does not exist, and she fails to produce evidence to show that Harnratty was not involved in the decision. *See Burdine*, 450 U.S. at 256.

Hogan also claims that she did not agree to telework as required by Library policy. However, even assuming that Hogan did not consent to being placed on telework status, she has not shown that this constituted an adverse action or that the Library believed it was violating its own policy. Hogan further alleges that employees with pending conduct issues are not permitted to telework. But that policy relates to employees who are *applying for* telework status, and Hogan did not apply to telework. Pl.'s Op. Summ. J., Ex. 63 at 2–3 ("To be considered for telework, employees must not have any documented conduct issues pending at the time of the application to telework.").

Hogan thus fails to produce evidence to create a genuine dispute over whether Newlen honestly believed he was following the Library's procedures. *See Morris*, 825 F.3d at 671.

### iii. Hogan failed to show Newlen isolated her to hide discriminatory animus.

Finally, Hogan contends that Newlen tried to isolate her and conceal his discrimination by prohibiting her from contacting the Librarian, placing her on administrative leave without proper approval, and placing her on telework.

Regardless of whether Newlen was her direct supervisor, the record shows that Library policy prevented Hogan from meeting directly with the Librarian. *See* Morrison's Dep. at 103:15–21. ("The standard practice was that there would be no meetings with the Librarian without somebody present to take notes. But, also, that if it was a not senior level staff or not,

you know, a director of a service unit, that you would always have either the Deputy or the Chief of Staff or me or somebody in there.").  Moreover, Hogan cites no evidence showing that Newlen placed Hogan on administrative leave and telework status to hide his discriminatory animus.  Although Newlen wrote the administrative leave and telework memoranda, there is ample evidence that Library staff and the OGC approved and were aware of both actions and memoranda.  *See* Def.'s Obj. and Resp. to Pl.'s First Set of Interrogatories at 9 ("Question: Please provide . . . the name and position of the person(s) who drafted and wrote the [telework] assignments document given to Ms. Hogan.  Answer: Julia O'Brien, Assistant General Counsel, in consultation within OGC and other offices, drafted the assignments memo issued to Ms. Hogan.); Wang Dep. at 26:18–27:16 ("Question: Who made that decision in Suzanne's case [to put her on administrative leave]? Answer: It would have been made during that collective meeting; but, ultimately, the decision would be management saying this is what I want to do, and OGC and Workforce Management having to say whether they concurred or not. . . .  I concurred.").

To overcome summary judgment, Hogan needed to present specific facts—as opposed to mere allegations or conclusory statements—that would enable a reasonable jury to find that Newlen isolated her to hide his discrimination.  She has failed to do so.  *See Glass*, 786 F. Supp. 2d at 219 (holding that inferences of discrimination the plaintiff sought to draw from her allegations were "so vague and conclusory, and so far removed from the actual employment decision that [was] being challenged, that a reasonable fact-finder could not draw even the weakest inference of discrimination from [those] events.").  Therefore, Hogan has not shown that Newlen's proffered legitimate, nondiscriminatory reasons for termination are pretextual, and she

has not presented evidence that Newlen's discriminatory animus was the cause of her termination.

<em>b. Hogan fails to produce sufficient evidence that the Library intentionally discriminated against her because of her gender.</em>

Even if Hogan proffered sufficient evidence to rebut Newlen's honest belief that she was insubordinate, jeopardized library relationships, and violated ethics rules, she has pointed to no evidence that would permit a reasonable jury to find Newlen terminated her based on her gender. Hogan admits in her deposition that Newlen never made a negative remark about her gender, but claims gender discrimination can be inferred from his actions. *See* Hogan Dep. at 11:3–23. Specifically, Hogan alleges that Newlen stereotyped her as an "overly emotional" woman and viewed her differently than male employees.

### i. Hogan failed to show Newlen engaged in sex stereotyping.

Sex stereotyping is a form of sex discrimination cognizable under Title VII. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250 (1989). "Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually *relied on* her gender in making its decision." *Id.* at 251 (emphasis added). "For example . . . a mere reference to 'a lady candidate' might show that gender 'played a role' in the decision, but by no means could support a rational factfinder's inference that the decision was made 'because of' sex." *Id.* at 277 (O'Connor, J., concurring). Hogan contends that Newlen engaged in sex stereotyping by viewing her as "overly emotional," calling her "despondent and immobilized," and saying that "she cried" during meetings. Pl.'s Op. Summ. J. at 34–35.

At his deposition, Newlen called Hogan "despondent and immobilized" when asked to recall Kathy Ott's description of Hogan at the 2014 Gershwin Prize concert. Newlen Dep. at

60:3–7, 61:5–8. However, that testimony was simply Newlen's recollection of *Ott's* description of Hogan. There is no evidence in the record that Newlen himself described Hogan in that manner or that he relied on Ott's description as a reason for her termination. *See Price Waterhouse*, 490 U.S. at 251; *see also Robinson v. Red Coats, Inc.*, 31 F. Supp. 3d 201, 213 (D.D.C. 2014) ("[C]onclusory allegations of discriminatory animus lacking any factual basis in the record are insufficient to defeat summary judgment."). And both Newlen and Hogan testified that Hogan cried during her meetings with Newlen. Newlen Dep. at 75:4–9; Hogan Dep. at 82:12–15. Even viewing the facts in the light more favorable to Hogan, a reasonable jury could not conclude that Newlen's recollection of Ott's description of Hogan's behavior proves he harbored a discriminatory animus based on her gender that led to her termination.

Finally, Hogan claims that Newlen called her "emotional" during their April 28, 2015 meeting, and Newlen cites that meeting as one of the reasons for her termination. *See* Notice of Proposed Adverse Action at 2 (citing that Hogan engaged in "inappropriate conduct" during a meeting on April 28, 2015, including becoming "increasingly agitated and disrespectful in comportment"). Hogan points to the Library's Answers to Interrogatories to support her contention. *See* Library's Obj. and Resp. to Plaintiff's First Set of Interrogatories at 4 (The Library stated that Newlen made the decision to have Hogan escorted out of the building "[b]ecause of previous meetings with Mr. Newlen where Ms. Hogan became emotional, and/or agitated and/or physically aggressive."). The Library argues that Newlen never directly called Hogan emotional, and that it was Hogan's own recollection that the meetings with Newlen and Mao were "emotional." *See* Def.'s Reply at 16, ECF No. 24.

Hogan relies on two cases for the proposition that stereotyping women as "emotional" can be evidence of gender discrimination. *See Cases v. Gonzales*, 2006 WL 2794955, at *18

(N.D. Ill. Sept. 28, 2006) (finding sex stereotyping when the employer approached the female employee, lifted her out of her chair, hugged her, rubbed her back, and said: "She just wants to be treated like a baby. There, there, baby, it's ok."); *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (finding sex stereotyping during hiring when the employer testified that female candidates tend to "[get] emotional" and therefore fail to get the job done and fail to boost the morale and atmosphere of the group). The Library responds that there is "no holding in this Circuit that being emotional is a stereotypically female trait, and there is no evidence in this record from which the Court could find the stereotype to be widely held." Def.'s Reply at 16. It relies on four cases which hold that describing women as "emotional" is not sex stereotyping indicative of gender discrimination. *See Arjangrad v. JPMorgan Chase Bank NA*, 2012 WL 1189750, at *23 (D. Or. Apr. 9, 2012) ("[Plaintiff] fails to present any authority recognizing [being emotional] as [a] commonly accepted female norm[]."); *Jackson v. St. Catherine Hospital, Inc.*, 2016 WL 466508, at *5 (N.D. Ind. Feb. 8, 2016) ("Seemingly, it is [plaintiff's] belief that any comment about her emotional state was also a statement about her gender, as if only women can be characterized as emotional when they are loud and belligerent. Although that is her belief, there is no evidence that it was [her supervisor's]."); *Kob v. City. of Marin*, 2009 WL 10680775, at *8 (N.D. Ca. Nov. 25, 2009) ("Plaintiff claims to have been called 'emotional,' 'irrational,' 'abrasive,' 'difficult,' 'confrontational,' and 'divisive.' Those adjectives are not particular to women and can just as easily describe a man."); *Blasdel v. Northwestern Univ.*, 687 F.3d 813, 819 (7th Cir. 2012) (affirming grant of summary judgment where official recalled plaintiff's "emotional need to be heard").

The facts here are different from the cases which found that the word "emotional" can be sex stereotyping. *Gonzalez* involved an employer who physically touched and belittled an

employee, *see* 2006 WL 2794955, at *18, and *Lindahl* involved an employer who admitted to not hiring females because they are "too emotional," *see* 930 F.2d at 1439. Here, Hogan produced no evidence that Newlen characterized Hogan as "emotional" due to her gender, *see Jackson*, 2016 WL 466508, at *5, or that he used the term as an adjective particular to women, and not to men, *see Kob*, 2009 WL 10680775, at *8.

Hogan thus fails to show that Newlen relied on his alleged remark in his decision to terminate her employment.

### ii. Hogan failed to show Newlen treated her differently than male employees.

Hogan alleges that Newlen viewed her differently than similarly-situated male employees. "A plaintiff may support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group." *Walker v Johnson*, 798 F.3d 1085, 1092 (D.D.C. 2015) (citing *Brady,* 520 F.3d at 495 & n.3); *see also Royall v. Nat'l Ass'n of Letter Carriers, AFL–CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008) ("A plaintiff, who retains the burden of persuasion throughout, may show pretext in a number of ways, including by offering evidence of more favorable treatment of similarly situated persons who are not members of the protected class.") (citation omitted).

In order to show that she is similarly situated to male employees, Hogan must present evidence "that all of the relevant aspects of her employment situation were nearly identical" to the male employees she contends were treated more favorably. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (internal citation omitted). This entails showing "that [Hogan] and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of [her] employment situation

were nearly identical to those of the other employee.'" *Cooper v. Nielsen*, 2019 WL 1254933, at *6 (D.D.C. Mar. 19, 2019) (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016)). Hogan has failed to do so. She first argues that gender discrimination can be inferred because Newlen only requested access to two other employees' e-mail accounts in his 40-year career at the Library, and those employees viewed pornography at work. But she does not allege that the two employees were male, or that they were terminated. *See* Pl.'s Op. Summ. J., Ex. 14 at 204:14–205:15. Even if the two employees were male and were not terminated, Hogan further fails to establish the employees as comparators because there is no evidence to determine whether they were charged with offenses of comparable seriousness and whether Hogan's employment situation was identical. *See Cooper*, 2019 WL 1254933 at *6.

Hogan also claims that Newlen only terminated three other employees during his career, but she presents no evidence that the employees committed similar offenses or demonstrates whether their jobs were similar to Hogan's. Pl.'s Op. Summ. J.at 21. Based on the paucity of comparator evidence, the court finds that a reasonable jury could not find that Newlen terminated Hogan because of her gender.

Finally, the person Hogan claims took over her Gershwin prize responsibilities, Susan Vita, is also a woman. *See Ames v. Nielsen*, 286 F. Supp. 3d 70, 89 (D.D.C. 2017) ("Finally, and perhaps most critically, the person Plaintiff claims effectively replaced her . . . is herself an African–American female."); Def.'s Mot. Summ. J at 41, Ex. 12 ¶¶ 2, 9. This fact "cuts strongly against any inference of [gender] discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("[A] replacement within the same protected class cuts strongly against any inference of discrimination."). The Library also produced evidence that Newlen promoted six women to senior positions during his tenure as Chief of Staff and terminated one male employee for

misconduct.  *See* Def.'s SOF ¶¶ 11–12; Newlen Aff. ¶¶ 2, 3.  Thus, the court finds that no reasonable jury could conclude that the real reason for Hogan's termination was gender discrimination.  *See Ames*, 286 F. Supp. 3d at 89 (finding no reasonable jury could conclude the real reason for a termination was age, race, or gender discrimination when the terminated employee's replacement was in the same protected classes as Plaintiff's discrimination claim).

Because Hogan failed to produce evidence of Newlen's discriminatory animus towards her, the court need not proceed past the first prong of the cat's paw analysis to reach its conclusion that her gender discrimination claim cannot survive Defendant's motion for summary judgment.  Therefore, the court will grant the Library's motion with respect to the Title VII gender discrimination claim (Count I).

### B.  Hostile Work Environment Claim

Hogan alleges she was subjected to a hostile work environment because Newlen's ongoing harassment was sufficiently severe and based on her gender.

"A plaintiff asserting a claim based on a hostile work environment faces a high hurdle." *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (D.D.C. 2016).  To prevail on such a claim, a plaintiff must establish that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "[T]he standard for severity and pervasiveness is . . . an *objective* one."  *Baird v. Gotbaum*, 792 F.3d 166, 172 (D.C. Cir. 2015) (emphasis in original).  By adhering to these demanding standards, courts ensure that Title VII does not become a "general civility code" and, "when properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace."  *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted).  In assessing a hostile work environment claim, "the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201.  These hostile acts "must be adequately connected to each other . . . as opposed to being an array of unrelated discriminatory or retaliatory acts." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

Hogan's allegations fail to clear this high hurdle.  She testified that her hostile work environment claim is predicated on the following actions: (1) Newlen not "returning collegiality" when he became Chief of Staff; (2) Newlen not "showing respect for her position. . .  and not taking into account [her] longevity in the office, [her] position, and who [she] reported to, and the work [she] did;" (3) Newlen "screaming" at her on April 28, 2015 for going into the CRO conference room and being insubordinate; (4) her office being relocated to the Music Division; (5) her being excluded from Director's meetings; (6) Newlen not looking at her performance reviews or position description before his first meeting with her; (7) her not being allowed to meet with the Librarian outside the presence of Mao or Newlen; and (8) her being excluded from funding decisions related to the Gershwin prize.  *See* Hogan Dep. at 108:14–114:20.

None of Hogan's allegations, considered in isolation or cumulatively, "show an environment so pervaded with discriminatory abuse as to alter the conditions of plaintiff's employment." *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 89 (D.D.C. 2013) ("Occasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment."); *see also Richard v. Bell Atlantic Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002) ("[R]ude comments, unjust criticism, and stressful working conditions, amount to ordinary tribulations of the workplace that [are] insufficient as a matter of

law for a hostile environment case.") (internal citation and quotation marks omitted and alteration added); *Magowan v. Lowery*, 166 F. Supp. 3d 39, 70 (D.D.C. 2016) (concluding that allegations of "rude emails, lost tempers and workplace disagreements" were insufficient support for hostile work environment claim).

Hogan's allegations that Newlen excluded her from funding decisions related to the Gershwin prize, forbade her from forwarding internal e-mails to Swift, and forbade her from meeting with Dr. Billington, "[a]lthough cumbersome and potentially embarrassing," are "not so extreme" that they "meet the 'demanding standard' for alleging a hostile work environment claim." *Nichols v. Young*, 248 F. Supp. 3d 1, 10 (D.D.C. 2017) (quoting *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 102 (D.D.C. 2012)) (finding no hostile environment claim when employee was not permitted to send e-mail messages and was approached daily by supervisors regarding her work).

And although Hogan may have been offended by Newlen's "failure to return collegiality," "not showing respect for her position," and "not looking at her performance reviews or position description," "subjective harm is insufficient to support a hostile work environment claim because the test for severity and pervasiveness is an objective one." *Gray v. Foxx*, 637 Fed. Appx. 603, 608 (D.C. Cir. 2015); *see also Baird*, 792 F.3d at 172. Even viewing the evidence in the light most favorable to Hogan, these incidents constitute "ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, which would not permit a reasonable jury to conclude that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [Hogan]'s employment and create an abusive working environment," *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21) (internal quotation marks omitted).

Similarly, Newlen's decision to move Hogan's office to the Music Department's floor—in line with Newlen's alleged reorganization of her job responsibilities to the Music Department—is not evidence of frequent, severe discriminatory conduct that unreasonably interfered with her work performance, but is an "ordinary daily workplace decision" insufficient to establish a hostile work claim, *Bergbauer*, 934 F. Supp. 2d at 89, as was Newlen's excluding her from Director's meetings, from which several male and female employees were also excluded, Def.'s SOF ¶ 29.

Hogan's allegation that Newlen screamed at her during their April 28, 2015 meeting presents a slightly closer call. Courts have found that a single, isolated incident can create a hostile work environment, but those cases tend to involve extremely serious acts. *Faragher*, 524 U.S. at 788 ("[I]solated incidents (unless extremely serious) will not amount to" a hostile work environment); *compare Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) (finding no hostile work environment when a co-worker caressed the plaintiff on his knee, placed her breast on his arm, and placed her fingers on his buttocks), *with Simms v. Ctr. for Corr. Health & Policy Studies,* 794 F. Supp. 2d 173, 193 (D.D.C. 2011) (finding a hostile work environment when a co-worker asked out plaintiff every time he saw her, harassed her daily for two years by commenting on her appearance, asking to see her body, staring at her, undressing her with his eyes, and physically accosting her at work).

Absent such "extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment." *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C. Cir. 2002) (finding one incident with employer's "verbal barrage of profanity was not sexually suggestive in any way or otherwise related to or caused by plaintiff's gender" and therefore insufficient to state a hostile work environment claim). "Even a few isolated incidents of

offensive conduct do not amount to actionable harassment." *Id.* ("Even if [defendant's] use of profane language could arguably be characterized as sexual harassment, which it cannot, a single telephone call is not sufficiently severe and pervasive to constitute a hostile work environment."). *Id*. at 1133. Based on the record, a single hostile conversation between Hogan and Newlen, (over Hogan's allegedly insubordinate actions), while potentially unpleasant, falls in a different category than the extreme conduct required for actionable harassment. Newlen's screaming at the meeting is more akin to "lost tempers and workplace disagreements," *Magowan v. Lowery*, 166 F. Supp. 3d at 70, which are the kind of "ordinary tribulations of the workplace" into which the court cannot wade. *Bergbauer*, 934 F. Supp. 2d at 89. Newlen's isolated display of frustration or anger does not rise above the level of "merely offensive" into the category of a discriminatory, abusive, hostile work environment. *Harris*, 510 U.S. at 21.

Furthermore, Hogan does not connect any allegedly hostile behavior to her gender. *See Leach v. National Railroad Passenger Corp.*, 128 F. Supp. 3d 146, 154 (D.D.C. 2015) ("A claim for hostile work environment based specifically on sex must show that . . . the harassment was based on sex."); *see also Gray*, 637 Fed. Appx. at 608 (summary judgment granted for employer because being "yelled [at] and belittled" was unconnected to plaintiff's protected status). Hogan alleges that Newlen viewed her as a "hysterical woman," fixated on her crying, and "berated her for becoming emotional and claimed to be embarrassed for her." Pl.'s Op. Summ. J. at 44. However, the only evidence that purports to show discrimination based on gender is Newlen describing Hogan as "emotional" during their April 28, 2015 meeting, and later recalling that "she cried" each time they met. Even viewing the evidence in the light most favorable to Hogan, her allegations are not enough to connect the allegedly hostile behavior to her gender. The Supreme Court has explained that "mere utterance of an epithet which engenders offensive

feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quotation marks and alteration omitted); *see also Slate v. Pub. Def. Serv. for D.C.*, 31 F. Supp. 3d 277, 296 (D.D.C. 2014) (explaining that "the D.C. Circuit has repeatedly emphasized that casual or isolated manifestations of a discriminatory environment, such as a few [gender] slurs" do not necessarily give rise to a hostile work environment claim) (internal quotation marks omitted).

Because Hogan's allegations fail to demonstrate the requisite severity or pervasiveness and connection to her gender to prove a hostile work environment, the court will grant the Library's motion for summary judgment with respect to the Title VII hostile work environment claim (Count IV).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 20, will be granted.

A corresponding Order will be issued separately.

Date:  September 11, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge